## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 14 2019, 6:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Carlos I. Carrillo
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Clyde Nelson Magnum Kelley, III, | November 14, 2019 |
| *Appellant-Defendant,* | Court of Appeals Case No. 19A-CR-890 |
| v. | Appeal from the Tippecanoe Superior Court |
| State of Indiana, | The Honorable Randy J. Williams, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 79D01-1807-F5-130 |

**Altice, Judge.**

# Case Summary

Following a bench trial, Clyde Kelley, III, was convicted of Level 6 felony battery resulting in moderate bodily injury, Level 6 felony strangulation, Level 6 felony domestic battery, two counts of Level 6 felony resisting law enforcement, and one count of Class A misdemeanor resisting law enforcement. The trial court subsequently sentenced Kelley to an aggregate term of seven years for his convictions. On appeal, Kelley presents eight issues for our review, which we consolidate and restate as:

1. Are Kelley's convictions for battery resulting in moderate bodily injury, strangulation, and domestic battery supported by sufficient evidence?

2. Do Kelley's multiple convictions for resisting law enforcement violate double jeopardy principles?

3. Did the trial court abuse its discretion in sentencing Kelley?

4. Is Kelly's sentence inappropriate in light of the nature of the offense and his character?

We affirm in part, reverse in part, and remand with instructions.

# Facts & Procedural History

The facts most favorable to the convictions follow. In 2017, Kelley lived in Kentucky and was in a relationship with Star O'Bannon. By July 2018, their relationship had turned "very hostile," so O'Bannon broke up with Kelley and went to stay with Vesheena Walton, who lived in an apartment in West

Lafayette, Indiana. *Transcript Vol. II* at 19. In an effort to reconcile, O'Bannon invited Kelley to visit her in West Lafayette, and Kelley did so on July 12, 2018. When Kelley arrived, he and O'Bannon went out to dinner and then shopping.

[4] Once back at Walton's apartment, Kelley and O'Bannon remained outside and argued about another woman. Walton came out several times to check on O'Bannon. After about an hour, O'Bannon told Kelley that she "want[ed] to break up" and asked him to leave. *Id.* at 21. Kelley said that he was not going to leave until he got "his revenge" and then he grabbed a crowbar out of his vehicle and hit the passenger window of O'Bannon's car, shattering it. *Id.* at 65. Kelley then got in his car and drove away. Walton called the police.

[5] Officer Drew Adams of the West Lafayette Police Department was dispatched in response to the call and was advised that Kelley was driving a blue Ford Mustang. As Officer Adams was driving toward the apartment complex, he passed a car matching the description and initiated a traffic stop. After talking to Kelley, Officer Adams escorted Kelley back to the apartment complex, where Officer Adams presented Kelley with a trespass warning.[1]

[6] About an hour later, Walton drove to a nearby gas station and O'Bannon started cleaning the glass out of her car and taking items from her car into

---

[1] Officer Adams did not arrest Kelley for criminal mischief after it was determined that Kelley and O'Bannon were both on the insurance for O'Bannon's vehicle and after Kelley stated that he would pay for the damage he caused to the car window.

Walton's apartment. On her second trip, Kelley ran up to O'Bannon in the common area outside Walton's apartment door. Kelley pushed O'Bannon against the wall, put his forearm against her and a knife to her throat, and said, "bitch if you scream, I will kill you." *Id*. at 27. As Kelley walked O'Bannon back outside, Walton pulled up in her car. Kelley put his knife back in his pocket, but when Walton questioned why Kelley was there, Kelley took the knife out and made a stabbing motion toward O'Bannon's chest. O'Bannon took off running. Kelley then approached Walton, who was still sitting in her car, and began stabbing her through her open car window. Kelley then took off running after O'Bannon.

[7]     Kelley caught up with O'Bannon and after a "little tussle," they both fell to the ground. *Id*. at 29. Once on the ground, Kelley put both of his hands around O'Bannon's neck and began choking her. O'Bannon could not breathe and felt as though Kelley was "crushing" her throat. *Id*. Kelley had his hands around O'Bannon's neck for only a short time before he again put his knife to her throat, poking her with the sharp point of the knife blade. Kelley told O'Bannon, "I could have killed you," and then he got up and ran away. *Id*. at 30. After Kelley was gone, O'Bannon went to find Walton and located her at another friend's apartment. Walton was hysterical and was bleeding from cuts on her hand, shoulder, chest, and stomach. Walton had already called the police to report the attack by Kelley.

[8]     Officer Lutz of the West Lafayette Police Department was on duty at 3:00 a.m. on Friday July 13, 2018, when the "all units call" came over the radio reporting

the stabbing and identifying the stabbing suspect's vehicle as a blue Mustang. *Id*. at 123. As Officer Lutz drove toward the identified location, he passed the suspect vehicle. As soon as Officer Lutz turned his car around, Kelley sped up. Officer Lutz activated his emergency lights and continued to follow Kelley, who continued to speed up while making several "quick maneuvers". *Id*. at 125. Kelley eventually pulled over and exited the car. Despite Officer Lutz's orders to stop, Kelley ran into a wooded ravine. Not knowing if Kelley was armed, Officer Lutz decided not to further pursue Kelley for his own safety and requested additional assistance.

[9] Deputies Kenneth Rooze and Austin Waibel of the Tippecanoe County Sheriff's Department learned of the search for Kelley as they started their Friday morning shifts. Deputy Rooze went to assist with the search. He eventually saw an individual matching the suspect's description walk into a McDonald's restaurant and then out another set of doors. When Deputy Rooze engaged Kelley in the parking lot, Kelley initially put his hands up. As Deputy Rooze reached for Kelley's arm to detain him, Kelley took off running. Deputy Rooze gave chase but could not keep up with Kelley. Deputy Rooze requested assistance as he returned to his police vehicle.

[10] Deputy Waibel also assisted in the search and set up a perimeter around where Kelley was believed to be. When Kelley emerged from a wooded area, Deputy Waibel ordered Kelley to kneel. Kelley paused, but turned and ran as Deputy Waibel started to approach him. Deputy Waibel pursued Kelley on foot through a wooded area until Deputy Waibel fell going down a creek

embankment and sustained an injury to his wrist. Thereafter, Officer Kyle Goodman of the West Lafayette Police Department saw Kelley emerge from the wooded area. He began chasing Kelley and ordered him to stop. Officer Goodman caught up with Kelley and apprehended him.

[11] On July 18, 2018, the State charged Kelley with Count I, Level 5 felony battery by means of a deadly weapon; Count II, Level 6 felony battery resulting in moderate bodily injury; Count III, Level 6 felony strangulation; Count IV, Class A misdemeanor domestic battery; Count V, Level 6 felony resisting law enforcement; Count VI, Level 6 felony resisting law enforcement; and Count VII, Class A misdemeanor resisting law enforcement. The State also filed an information alleging Kelley was a habitual offender. The State subsequently added Count VIII, Class A misdemeanor invasion of privacy, Counts IX and X, Class A misdemeanor trespass, and Count XI, Level 5 felony intimidation with a deadly weapon.[2] On October 30, 2018, Kelley filed his notice of self-defense.

[12] A bench trial commenced on March 5, 2019. At the conclusion of the State's evidence, Kelley moved for a directed verdict as to Counts IV, VIII, IX, and X. The trial court dismissed Counts VIII, IX, and X, but denied Kelley's request regarding Count IV. The bench trial continued the following day. At the

---

[2] Counts I and II identified Walton as the victim. Counts III, IV, and XI identified O'Bannon as the victim.

conclusion of all the evidence, the trial court found Kelley guilty of Counts II, III, IV, V, VI, and VII[3] and entered judgment of conviction thereon.

[13] The trial court held a sentencing hearing on March 29, 2019. The court identified as mitigating factors Kelley's acknowledgment of responsibility, history of employment, education, and support of others. The court identified Kelley's criminal history as an aggravating factor, specifically noting that Kelley had accumulated a 2009 rape conviction, a manslaughter conviction in Kentucky, prior convictions for resisting law enforcement, theft, and false informing, and four petitions to revoke probation. The court also found as aggravating that Kelley was on parole at the time of the instant offense and that he had a child support arrearage. The trial court sentenced Kelley to two years on Counts II and III and one year on Count IV and ordered Counts III and IV be served concurrently, but consecutive to Count II. With regard to the resisting law enforcement convictions, the trial court sentenced Kelley to one and a half years on Counts V and VI and one year on Count VII and ordered the sentences on Counts V and VII be served concurrently, but consecutive to Count VI. The court ordered the sentences on Counts V, VI, and VII to be served consecutive to Counts II and III, for a total aggregate sentence of seven years. Kelley now appeals. Additional facts will be provided as necessary.

---

[3] The trial court acquitted Kelley of Counts I and XI.

# Discussion & Decision

## 1. Sufficiency

[14] Kelley argues that the evidence is insufficient to support his convictions under Counts II, III, and IV because the State failed to rebut his claim of self-defense and because the victims' testimonies were incredibly dubious. The standard of review for a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency claim. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). We consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Tharpe v. State*, 955 N.E.2d 836, 844 (Ind. Ct. App. 2011), *trans. denied*. We neither reweigh the evidence nor judge the credibility of witnesses. *Wilson*, 770 N.E.2d at 801. The trier of fact is entitled to determine which version of the incident to credit and is the sole judge of the effect that any discrepancies or contradictions might have on the outcome of the case. *Scott v. State*, 867 N.E.2d 690, 695 (Ind. Ct. App. 2007), *trans. denied*.

[15] Self-defense is a legal justification for an otherwise criminal act. *Bryant v. State*, 984 N.E.2d 240, 250 (Ind. Ct. App. 2013), *trans. denied*. "A person is justified in using reasonable force against any other person to protect the person ... from what the person reasonably believes to be the imminent use of unlawful force." Ind. Code § 35-41-3-2(c). The person, however, is not justified in using force if, among other things, "the person has entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person

nevertheless continues or threatens to continue unlawful action." I.C. § 35-41-3-2(g)(3).

[16] To prevail on his self-defense claim, Kelley must show that he: "(1) was in a place where he had a right to be; (2) acted without fault; and (3) was in reasonable fear o[r] apprehension of bodily harm." *Richardson v. State*, 79 N.E.3d 958, 964 (Ind. Ct. App. 2017), *trans. denied*. When a claim of self-defense finds support in the evidence, the State bears the burden of negating at least one of the necessary elements. *Id*. If a defendant is convicted despite his claim of self-defense, we will reverse only if no reasonable person could say that self-defense was negated beyond a reasonable doubt. *Id*.

[17] In support of his claim of self-defense, Kelley directs us to his version of what transpired. Kelley claims he was in a place he had a right to be because O'Bannon invited him back to Walton's apartment, that he grabbed O'Bannon by the jaw only after O'Bannon "mugged" him, which he described as O'Bannon pushing his forehead with the palm of her hand, and that his forearm ended up across O'Bannon's neck as he was fending off what he claims to have been a knife attack by Walton. *Transcript Vol. II* at 217.

[18] To rebut Kelley's claim of self-defense, the State relied upon evidence from its case-in-chief—that is, the testimony of O'Bannon and Walton, which painted a picture in stark contrast to Kelley's version of events. Indeed, O'Bannon testified that as she was walking toward Walton's apartment, Kelley ran up to her, pushed her against the wall, and placed a knife to her throat. After Walton

returned and confronted Kelley, Kelley stabbed O'Bannon and then attacked Walton with the knife through her driver's side window. Kelley continued the violence by running after O'Bannon, eventually catching up with her and engaging in a scuffle that resulted in them falling to the ground. Once on the ground, Kelley placed his hands around O'Bannon's neck and choked her. Despite his claims to the contrary, the evidence most favorable to the convictions reveals that Kelley was not in a place he had a right to be, and he was not defending himself, but rather, he instigated and willingly participated in the violence against O'Bannon and Walton. The State's evidence was sufficient to rebut Kelley's claim of self-defense.

[19] Kelley also challenges the sufficiency of the evidence by arguing that the testimonies of the victims were incredibly dubious. Application of the incredible dubiosity rule is extremely limited. Under this rule, we will impinge on the trier of fact's responsibility to judge the credibility of the witnesses only when confronted by "'inherently improbable' testimony or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.'" *Moore v. State*, 27 N.E.3d 749, 755 (Ind. 2015) (quoting *Tillman v. State*, 642 N.E.2d 221, 223 (Ind. 1994)). "[W]hile incredible dubiosity provides a standard that is 'not impossible' to meet, it is a 'difficult standard to meet, [and] one that requires great ambiguity and inconsistency in the evidence.'" *Id*. at 756 (quoting *Edwards v. State*, 753 N.E.2d 618, 622 (Ind. 2001)). "The testimony must be so convoluted and/or contrary to human experience that no reasonable person could believe it." *Edwards*, 753 N.E.2d at 622.

Here, both O'Bannon and Walton provided detailed testimony as to Kelley's attack on them. In claiming their testimonies were incredibly dubious, Kelley attempts to show inconsistencies by comparing O'Bannon's testimony with Walton's testimony and their respective testimonies with their statements to police immediately following the incident. Such inconsistencies, however, do not implicate the incredible dubiosity rule. Kelley's arguments in this regard are veiled requests to reweigh the evidence and assess the credibility of the victims, a task we will not undertake on appeal.

In sum, the facts as set forth above are sufficient to support the court's determination of guilt as to battery against Walton resulting in moderate bodily injury and strangulation and domestic battery against O'Bannon.

## 2. Double Jeopardy

Kelley argues that his multiple convictions for resisting law enforcement violate double jeopardy principles. Specifically, Kelley argues that his act of resisting was one continuous crime. As our Supreme Court has explained:

> The continuous crime doctrine is a rule of statutory construction and common law limited to situations where a defendant has been charged multiple times with the same offense. "The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime." The Legislature, not this Court, defines when a criminal offense is "continuous," e.g. not terminated by a single act or fact but subsisting for a definite period and covering successive, similar occurrences.

*Hines v. State*, 30 N.E.3d 1216, 1219 (Ind. 2015) (internal citations omitted). The continuing crime doctrine essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in time, place, singleness of purpose, and continuity of action as to constitute a single transaction. *Walker v. State*, 932 N.E.2d 733, 735 (Ind. Ct. App. 2010) (citing *Riehle v. State*, 823 N.E.2d 287, 296 (Ind. Ct. App. 2005), *trans. denied*).

[23] Here, Kelley was convicted of Level 6 felony resisting law enforcement based on his act of fleeing from Officer Lutz in a vehicle (Count VI), Level 6 felony resisting law enforcement for fleeing from Deputy Waibel which resulted in injury to Deputy Waibel (Count V), and Class A misdemeanor fleeing on foot from Officer Goodman and/or Deputy Rooze (Count VII). Kelley argues that there was one, ongoing pursuit from the point at which he initially fled until he was apprehended hours later. The State argues that Kelley's act of resisting was not continuous as each encounter with law enforcement was separated by a period of time.

[24] Whether convictions violate double jeopardy is a pure question of law, which we review de novo. *Rexroat v. State*, 966 N.E.2d 165, 168 (Ind. Ct. App. 2012), *trans. denied*. We begin by noting that in the context of multiple resisting law enforcement convictions, we have repeatedly held that a defendant's act of fleeing by a vehicle and then *immediately* on foot constitutes one continuous act of resisting law enforcement. *See, e.g., Norris v. state*, 113 N.E.3d 1245, 1253

(Ind. Ct. App. 2018); *Lewis v. State*, 43 N.E.3d 689, 691 (Ind. Ct. App. 2015); *Nevel v. State*, 818 N.E.2d 1, 5 (Ind. Ct. App. 2004).

[25]    Here, Kelley fled from Officer Lutz by vehicle during the early morning hours of July 13. This is the first instance of resisting law enforcement (Count VI). His convictions for resisting law enforcement on foot (Counts V and VII), however, are not based on Kelley's actions *immediately* following his fleeing from Officer Lutz. Rather, hours passed before Deputies Rooze, Waibel, and Goodman encountered Kelley. Under the facts of this case, we conclude that the instances of resisting giving rise to Kelley's convictions under Counts V and VII were not a continuation of his resisting by vehicle giving rise to his conviction under Count VI. There is thus no double jeopardy violation as to these two separate instances of resisting law enforcement.

[26]    However, the instances of resisting giving rise to Counts V and VII were close in time, in the same general vicinity, and part of the same act of fleeing. We therefore conclude that Kelley's multiple convictions for resisting law enforcement under Counts V and VII violate the continuing crime doctrine. We therefore reverse Kelley's conviction for Class A misdemeanor resisting law enforcement (Count VII) and remand to the trial court to vacate such conviction and the sentence imposed thereon.

### 3. *Abuse of Discretion in Sentencing*

[27]    We first address Kelley's claim that the trial erred in entering his domestic battery conviction as a Level 6 felony. Kelley is correct that he was charged

with Class A misdemeanor domestic battery and such charge was never amended. At the conclusion of the evidence, the trial court simply stated that it found Kelley guilty of domestic battery without any further statement as to the level of the offense. In the court's bench trial minutes, the court indicated that Kelley was convicted of domestic battery as a Level 6 felony. At the sentencing hearing, the State pointed out the error in the bench trial minutes as to the level of the domestic battery offense, and the court acknowledged such. In its sentencing order, however, the trial court again incorrectly identified Kelley's conviction under count IV as being for domestic battery as a Level 6 felony.[4]

[28] The clerical error aside, the trial court also found that due to double jeopardy concerns, the domestic battery conviction "merged" with the strangulation conviction. *Transcript Vol. III* at 63. The State does not dispute that Kelley's convictions for strangulation and domestic battery violate double jeopardy principles. Where a double jeopardy violation has occurred and judgments of conviction have been entered, a trial court's act of merging, without vacating the conviction, is not sufficient to cure the double jeopardy violation. *See Morrison v. State*, 824 N.E.2d 734, 742 (Ind. Ct. App. 2005) (noting that a double jeopardy violation cannot be remedied by the "practical effect" of concurrent sentences or by merger after a conviction has been entered), *trans. denied*. We therefore remand to the trial court with instructions to vacate

---

[4] The abstract of judgment shows that Kelley was convicted of domestic battery as a Class A misdemeanor.

Kelley's domestic battery conviction. There is thus no need to order correction of the clerical error in the trial court's sentencing order regarding the level of the domestic battery offense.

[29] We now turn to Kelley's argument that the trial court abused its discretion in sentencing him to an aggregate term of seven years. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id.* at 490 (*quoting K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)). A trial court may abuse its sentencing discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91.

### *a. Balancing*

[30] Kelley argues that the record "does not specifically show that the trial court 'balanced' the mitigating and aggravating circumstances as required in order to impose enhanced sentences." *Appellant's Brief* at 43. Since *Anglemyer*, however, trial courts are no longer obligated to weigh aggravating and mitigating factors when imposing a sentence. 868 N.E.2d at 491. Where the sentence imposed

falls within statutory sentencing parameters, a trial court cannot be said to have abused its discretion in failing to properly weigh aggravating and mitigating factors. *Id.*

### b. Mitigators

[31]     Kelley argues that the trial court abused its discretion in failing to consider two of his proffered mitigating factors. Specifically, Kelley asked the court to consider that he acted under provocation and that he offered to pay restitution to his victims. A trial court need not consider proffered mitigating circumstances that are highly disputable in nature, weight, or significance. *Creekmore v. State*, 853 N.E.2d 523, 530 (Ind. Ct. App. 2006), *clarified on reh'g*, 858 N.E.2d 238. On appeal, the burden rests with the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Carter v. State*, 711 N.E.2d 835, 838 (Ind. 1999).

[32]     For the trial court to have found that Kelley acted under provocation, the trial court would have needed to accept his claim of self-defense that was based on his self-serving statements that O'Bannon "mugged" him and Walton attacked him with a knife. *Transcript Vol. II* at 217. The trial court was the finder of fact and clearly rejected Kelley's claim of self-defense. His provocation claim likewise fails for sentencing purposes. With regard to his offer to pay restitution, Kelley has not established how, given the nature of this case, an offer to pay restitution was a significant mitigating factor overlooked by the trial court.

### c. Aggravators

[33] With regard to aggravating factors, Kelley argues that the court abused its discretion in considering his support arrearage to be an aggravating factor. He asserts that the court's finding in this regard "was essentially that there was no hardship to Kelley's autistic minor son by Kelley being incarcerated because he was already in arrears." *Appellant's Brief* at 45. Although hard to follow, Kelley's argument seems to conflate an argument that the trial court abused its discretion in finding his arrearage to be an aggravating factor with a claim the trial court abused its discretion in failing to find that his incarceration would impose an undue hardship on his minor, autistic son. Regardless of the argument being made, Kelley has failed to establish that the trial court abused its discretion.

[34] Indeed, we note that in identifying aggravating factors, the court relied primarily on Kelley's criminal history, specifically noting his prior convictions for rape and manslaughter. Thus, even if we assume that the court abused its discretion in considering his support arrearage as an aggravating factor, we are convinced the trial court would have imposed the same sentence absent such consideration. *See Mendoza v. State*, 869 N.E.2d 546, 556 (Ind. Ct. App. 2007) (noting that "even if the trial court is found to have abused its discretion in the process it used to sentence the defendant, the error is harmless if the sentence imposed was not inappropriate"), *trans. denied.*

### d. Consecutive Sentences

[35]     Kelley argues that the trial court erred in ordering his sentences under Counts II and III to be served consecutively because such offenses arose out of an episode of criminal conduct. Ind. Code § 35-50-1-2(c), (d) provides that except for crimes of violence, "the total of the consecutive terms of imprisonment . . . to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed . . . four (4) years" if, as is the case here, the most serious crime for which the defendant is sentenced is a Level 6 felony.

[36]     Here, the trial court imposed a two-year sentence on both Count II and Count III and ordered that they be served consecutively. Even if we assume that the convictions arose out of a single episode of criminal conduct, the trial court did not sentence Kelley in excess of the statutory limit. Kelley has not established that the trial court abused its discretion in ordering the sentences imposed on Counts II and III to be served consecutively.

### 4. Inappropriate Sentence

[37]     Kelley argues that his sentence is inappropriate. This court has the constitutional authority to revise a sentence authorized by statute if, "after due consideration of the trial court's decision," we find that the sentence imposed is inappropriate in light of the nature of the offense and the character of the offender. *See* Ind. Appellate Rule 7(B). The question under App. R. 7(B) is "not whether another sentence is more appropriate" but rather "whether the

sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). The burden is on the defendant to persuade the appellate court that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012).

[38]   In order to assess the appropriateness of a sentence, we first look to the statutory range established for the classification of the relevant offenses. Here, Kelley was convicted of Level 6 felony battery resulting in moderate bodily injury, Level 6 felony strangulation, and two counts of Level 6 felony resisting law enforcement.[5] The sentencing range for the Level 6 felonies is six months to two and one-half years, with the advisory sentence being one year. Ind. Code § 35-50-2-7(b). Kelley received an aggregate sentence of seven years.

[39]   With regard to the nature of the offense, we note that after Kelley was warned by police that he was not permitted to be at the apartment complex, he returned and instigated an attack on O'Bannon, pushing her against a wall, holding a knife to her neck, and threatening to kill her if she screamed. When Walton returned and confronted him, Kelley attacked her with a knife. As a result, Walton sustained injuries to her thumb, finger, shoulder, chest, and stomach. Kelley then ran after O'Bannon, and after he had her on the ground, he placed

---

[5] Because we have directed the trial court to vacate Kelley's Class A misdemeanor domestic battery conviction and Class A misdemeanor resisting law enforcement conviction, we will not consider such in our review of the appropriateness of his sentence.

his hands around her neck and choked her. After threatening her one last time, Kelley stood up and ran into a nearby wooded area. As a result of Kelley's attack, O'Bannon suffered from scratches and pain. With regard to the resisting law enforcement convictions, the record discloses that Kelley fled from numerous officers at different points in time. Kelley was on the run for hours before he was apprehended. There is nothing about the nature of the offense that is deserving of a lesser sentence.

[40] With regard to the character of the offender, we observe that Kelley was thirty-six years old at the time of sentencing. As an adult, Kelley had accumulated convictions for two misdemeanor offenses and seven felony offenses. Kelley admitted that much of his criminal history stemmed from his involvement in a gang. Kelley reported to the probation department that he had been a member of the Gangster Disciples from childhood until 2009. In 2009, Kelley was convicted of raping a woman as an "initiation" ritual for the Gangster Disciples. *Transcript Vol. III* at 57. In 2017, Kelley was charged with murder in Kentucky, although he entered into a plea agreement in which he agreed to plead guilty to manslaughter in the first degree. Kelley was on parole at the time of the current offense and has violated the terms of probation on at least four prior occasions. As the State aptly noted, "[Kelley]'s criminal history is violent and senseless. It shows repeated criminal conduct and a propensity of violence towards women." *Appellee's Brief* at 39. There is nothing about Kelley's character that warrants a reduction in his sentence. Kelley has not demonstrated that his seven-year aggregate sentence is inappropriate.

[41] Judgment affirmed in part, reversed in part, and remanded with instructions to vacate Kelley's convictions for domestic battery and resisting law enforcement as a Class A misdemeanor.

Brown, J. and Tavitas, J., concur.